[Crim. No. 3217.   First Dist., Div. One.   July 30, 1956.]

THE PEOPLE, Respondent, v. FREDERICK MORRIS, Appellant.

Mark C. Cali for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—Convicted on two counts (burglary and larceny), defendant claims the evidence is insufficient to support the burglary charge; i.e., that proof is lacking that he entered the building (Hale's Department Store, San Jose) "with intent to commit theft therein" as charged in the indictment, based upon Penal Code, section 459. He does not question the sufficiency of the evidence to support the larceny charge that he feloniously took money in excess of $200, the property of Hale's Department Store. (Pen. Code, § 487.)

Defendant correctly concedes that if a fair and logical inference can be drawn that he entered the building with intent to commit theft, the evidence is sufficient. (*People* v. *Smith,* 84 Cal.App.2d 509 [190 P.2d 941]; *People* v. *Franklin,* 106 Cal.App.2d 528 [235 P.2d 402]; *People* v. *Stewart,* 113 Cal.App.2d 687 [248 P.2d 768].) He contends that in this case such an inference cannot be drawn. Our examination of the record convinces us it can be.

Defendant was supervisor of the janitorial staff at Hale's and was being trained to perform the work of repairing cash registers. Upon occasion he substituted for the watchman whose duty it was to open the store in the morning and close it at night after all other employees had left. Upon the weekend here involved (Saturday to Monday, May 14-16, 1955) the watchman was absent and defendant was assigned his duties. On Saturdays the store closed for business at 5:30 p.m. Upon this Saturday, according to his testimony, defendant closed the store, locking all the doors and left about 7:50 p.m., about half an hour after all of the other employees had left. Upon opening the store the following Monday morning he phoned the store manager and the police that the cash registers had been burglarized.

Some 44 to 47 cash registers had been opened and $3,853 in money and $400 to $700 in Hale's "script" taken. Defendant had a key by means of which, and the tripping of a certain device, these cash registers could be opened from the rear. He knew how to work this device. Only five registers had been unopened, three of which could not be opened by

means of his key and two of which were in plain view of anyone who might be passing by the store.

The burglar alarm system was such that no one could enter the store without setting off the alarm except through a certain door which had a lock which recorded the time of opening and closing and the particular key used in doing so. The opening of this door would cause the alarm to sound unless the latter were turned off within five minutes. This lock recorder indicated that this door had been locked at 7:54 on Saturday, May 14, by means of defendant's key, and not again opened until 3:49 a.m. on Monday, May 16, by use of defendant's key. It is a fair inference that the money and the script were taken after the other employees left and before defendant left the store on Saturday, May 14.

The evidence tending to show that defendant entered the store on Saturday with intent to commit the theft turns upon a quite elaborate plan which defendant in advance of the event evolved for disposition of much of the property when taken.

He caused two suit cases, with contents, to be shipped to his mother in Villisca, Iowa. They were intercepted by police authorities and found to contain about $480 worth of men's wearing apparel of types that Hale's carried, a pillow slip containing $2,422.06 in money, two old gloves, and a cashier's stub which was positively identified by a duplicate which had gone to Hale's main cashier and had been kept in the store's files.

Defendant testified that he bought these suit cases and the wearing apparel for $75 from one Bob Schmidt, at the home of defendant's friend Joe Miller, on the 4th of May, 1955. The clothes were in the suit cases at that time. Defendant examined them and tried some on, but he saw neither the pillow slip nor any United States currency. The old gloves were not in either suit case at that time. He locked the suit cases and kept the key, leaving the suit cases at Miller's. He next saw the suit cases about five days later at Miller's home, in Miller's closet.

Defendant testified that on Saturday the 14th of May, he opened the store at 3:50 a.m. and left at 8 a.m. to go to Oakland to consult his doctor concerning an abdominal complaint. Upon his return he went to Joe Miller's about noon and asked him if he would mail the suit cases to defendant's mother, and Miller consented. Defendant gave Miller the address and $20 for shipping costs. Defendant did not see

the bags that day. Later he testified that he removed two pairs of trousers from the bags but did not say when he removed them; did not send them back to Iowa. Defendant returned to Hale's about 12:30 p. m. and remained there until he closed the store that evening. He next saw Miller about 2 a.m. of the following day, Sunday. It was a pre-arranged meeting at the Lucky Drive-In. Defendant had told Miller to meet him there after 2 a.m. Defendant said he wanted to get the shipping receipt for the mailing of the suit cases but Miller had not mailed them yet. They conversed for 35 or 40 minutes and then drove over to Los Gatos and back and then they stopped at a restaurant for breakfast. That Sunday afternoon he phoned his mother that he was sending her some clothes and asked her to hold them for him and that he would pick them up when he came back on his vacation.

In an interview with the police officer who was investigating the case, defendant gave an account of his activities this weekend, but he neither mentioned Miller nor that he had seen or been with him, nor did he mention the phone call to his mother. Later, when asked if he had phoned his mother and if he had shipped any boxes to her, he denied having done either. Still later, when told the bags contained $2,000 in money and a cash register slip that was definitely identified as having come from Hale's store, and that a statement had been obtained from Joe Miller, defendant admitted taking the money and that he had shipped the bags back home; and said that he burned the script on the Santa Clara-Los Gatos highway; that after he robbed the store, he stopped along the road and burned the script. Upon the witness stand, defendant admitted he had not told the officer he had been with Miller at the Lucky Drive-In or at the restaurant or had been driving around with Miller.

Miller testified that he first saw the suit cases at his house on Tuesday, May 3, 1955, that defendant had just bought them. They remained at his place until Saturday, May 14, when defendant came about noon to ask Miller to mail them, and gave Miller the address and $20 and said to insure them for $400. Defendant then put them in the trunk of Miller's car and they agreed on a meeting place, the Lucky Drive-In, at 2:15 or 2:30 Sunday morning, so defendant could pick up the shipping receipts for the bags. They met as agreed but Miller had not had time yet to mail the bags. They then took a drive to Los Gatos and on the way back stopped

at defendant's place and went over to a restaurant for breakfast and then parted. Later that day Miller drove to Reno, picking up a friend at Stockton and on the way back stopped at Truckee where he had his friend ship the bags to defendant's mother in Iowa. Miller was positive that defendant had not taken the bags back to repack them. He remembered telling the police officer that he received these suit cases prior to the time of the theft, but he did not remember having made the following statement (which the police officer later testified, by way of impeachment, Miller did make to him): That on Saturday defendant took the suit cases from Miller's home to his own apartment for repacking and then on Sunday morning at the Lucky Drive-In placed them in Miller's car. Although the evidence of this statement was admitted only by way of impeachment it cast doubt upon the veracity of Miller's testimony that defendant did not retake possession of the suit cases for repacking.

This evidence of a plan, a prearrangement for disposition of the stolen property, furnishes a sufficient basis for a logical inference that when defendant returned to the store Saturday afternoon he entered the building with the intent to commit theft therein.

Defendant asserts error also in the reading at the trial of certain testimony which had been given at the preliminary examination. The witness was Chief of Police Hinkle of Villisca, Iowa, who had intercepted the suitcases. He identified them and their contents at the preliminary examination. He then returned to Iowa and was not amenable to process in California. The reporter who took down the questions and answers certified that the transcript was correct. Defendant and his counsel were present at the preliminary and his counsel cross-examined the witness. As a result of the preliminary examination defendant was held over. Under these circumstances the reading of the transcript was proper. (Pen. Code, §§ 686 and 869; Code Civ. Proc., § 273.)

Later, during rebuttal, the district attorney informed the court and counsel that the reporter had discovered that in transcribing this testimony she had inadvertently omitted seven lines of questions and answers,* and moved that the

---

*The omitted portion read as follows: " 'A. That was bundled up.' 'Q. That was bundled up in the way it is bundled up now?' 'A. Yes.' 'Q. And marked in that manner?' 'A. Yes.' 'Q. I see a tag inside the pillowcase is a cashier's stub, where was that, was that in the suitcase when you opened it?' "

People's case be reopened for the purpose of reading the omitted portion to the jury. Defendant objected and moved that the reading of the entire transcript be stricken from the record. Both motions were denied. If the district attorney's motion had been granted, the omitted portion would have been inserted between the following question and answer: "Q. Will you look in the pillowcase now, Mr. Hinkle, tell us whether that money is still there as it was when you opened it? A. Yes." The People concede that the omitted portion should have been read to the jury but claim that no prejudice to defendant's case resulted from the omission. Defendant's counsel himself used the transcript at the trial, reading to the jury his cross-examination of the witness. He concedes that the omitted matter was not material. He does not claim the transcript is not substantially correct. He does contend that the mere fact of the omission of this passage destroys the very foundation for the reading of the transcript, and that the fact of the omission should have been presented in the presence of the jury instead of in chambers so that the jury could take that circumstance into consideration when weighing and appraising the Hinkle testimony. We think it was error not to lay this matter before the jury but we do not deem it prejudicial. We do not believe that knowledge of this inadvertent omission of these seven lines of questions and answers would have led the jury to discount the remainder of the transcript any more than it did the trial judge in whose views in that regard we concur. There was no error in the denial of defendant's motion to strike out all of the testimony of Hinkle.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.